IN THE UNTIED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CLIFTON MCNEIL BROOKS,

      Petitioner.

v.

MARK S. INCH, Secretary of the
Florida Department of Corrections
(FDC).

      Respondent.

CASE NO.  3:19-cv-787-MMH-MCR

## FDC'S EXHIBIT 25

# AMENDED INITIAL BRIEF -
# DIRECT APPEAL - 1D13-1073

E-Copy Received Aug 7, 2014 1:33 PM

L13-1-19833
H

# IN THE DISTRICT COURT OF APPEAL
## FIRST DISTRICT OF FLORIDA

CLIFTON BROOKS,          :

     Appellant,          :

v.          :          CASE NO. **1D13-1073**

STATE OF FLORIDA,          :

     Appellee.          :

_____/

Docketed
8·7·14
Florida Attorney
General

ON APPEAL FROM THE CIRCUIT COURT
OF THE **FOURTH** JUDICIAL CIRCUIT,
IN AND FOR **DUVAL** COUNTY, FLORIDA

**AMENDED INITIAL BRIEF OF APPELLANT**

NANCY A. DANIELS
PUBLIC DEFENDER
SECOND JUDICIAL CIRCUIT

**JOANNA A. MAUER**
ASSISTANT PUBLIC DEFENDER
FLA. BAR NO. **763251**
LEON COUNTY COURTHOUSE
SUITE 401
301 SOUTH MONROE STREET
TALLAHASSEE, FL 32301
(850) 606-8500
joanna.mauer@flpd2.com
ATTORNEY FOR APPELLANT

## TABLE OF CONTENTS

<u>PAGE(S)</u>

TABLE OF CONTENTS i

TABLE OF AUTHORITIES ii

PRELIMINARY STATEMENT 1

STATEMENT OF THE CASE 2

STATEMENT OF PRETRIAL MATTERS AND THE FACTS 3

SUMMARY OF THE ARGUMENT 23

ARGUMENT 25

 I. <u>The trial court failed to sufficiently conduct the Faretta inquiry with respect to appellant's competency to represent himself.</u> 25

 II. <u>The trial court fundamentally erred in failing to order a competency evaluation sua sponte despite information throughout the proceedings that raised a bona fide doubt as to appellant's competency.</u> 31

 III. <u>The trial court erred in admitting collateral acts of a sexual nature and this evidence became a feature of the trial.</u> 38

 IV. <u>The trial court failed to conduct a Faretta inquiry before imposing sentence.</u> 48

CERTIFICATE OF SERVICE 50

CERTIFICATE OF FONT SIZE 50

i

**TABLE OF AUTHORITIES**

CASES                                                                PAGE(S)

<u>Almond v. State,</u> 1 So.3d (Fla. 1st DCA 2009). . . . . . . . .  38

<u>Ashley v. State,</u> 265 So. 2d (Fla. 1972).. . . . . . . . . .  46

<u>Ballard v. State,</u> 899 So. 2d (Fla. 1st DCA 2005). . . . . .  46

<u>Barnes v. State,</u> 124 So.3d(Fla. 2013).. . . . . . 23, 35, 36, 38

<u>Culbreath v. State,</u> 903 So.2d(Fla. 2005) . . . . . . . . .  37

<u>Cuyler v. State,</u> 131 So.3d (Fla. 1st DCA 2014). . . . . . .  48

<u>Delgado v. State,</u> 776 So.2d (Fla.2000). . . . . . . . . 31, 34

<u>Drope v. Missouri,</u> 420 U.S. 162 (1975). . . . . . . . . . .  34

<u>Dusky v. United States,</u> 362 U.S. 402 (1960).. . . . . . . .  33

<u>Dydek v. State,</u> 400 So.2d (Fla. 2d DCA 1981) . . . . . . 39, 46

<u>Easterly v. State,</u> 22 So. 3d (Fla. 1st DCA 2009). . . . . .  46

<u>Faretta v. California,</u> 422 U.S. 806 (1975). . . . . . . . .  46

<u>Harris v. State,</u> 34 So.3d (Fla. 1st DCA 2010).. . . . . . .  38

<u>Hill v. State,</u> 473 So. 2d 1253 (Fla. 1985). . . . . . . . .  34

<u>Hill v. State,</u> 688 So.2d(Fla. 1996).. . . . . . . . . . . .  27

<u>Hudson v. State,</u> 992 So.2d(Fla. 2008).. . . . . . . . . . .  38

<u>Indiana v. Edwards,</u> 554 U.S.(2008)... . . . . . . . . 28, 35

<u>Kearse v. State,</u> 858 So.2d (Fla. 1st DCA 2003). . . . . . .  28

<u>Lewis v. State,</u> 31 So.3d (Fla. 1st DCA 2010). . . . . . . .  48

<u>McCray v. State,</u> 919 So.2d(Fla. 1st DCA 2006).. . . . . . .  38

<u>McDuffie v. State,</u> 970 So 2d (Fla. 2007) . . . . . . . . .  45

<u>McLean v. State,</u> 934 So.2d (Fla.2006).. . . . . . . . . . 42-45

<u>Molina v. State,</u> 946 So.2d(Fla. 5th DCA 2006).. . . . . . .  36

Moore v. State, 615 So.2d(Fla. 1 DCA 1993). . . . . . . . . . . 30

Mora v. State, 814 So.2d (Fla. 2002). . . . . . . . . . . . . 25

Nowitzke v. State, 572 So. 2d 1346 (Fla. 1990). . . . . . . . 34

Pantoja v. State, 59 So.3d (Fla. 2011); . . . . . . . . . . . 38

Pate v. Robinson, 383 U.S. 375 (1966).. . . . . . . . . . . . 34

Robertson v. State, 699 So.2d 1343 (Fla.1997).. . . . . . . 30, 35

Robinson v. State, 462 So.2d (Fla. 1st DCA 1984). . . . . 39, 47

Robinson v. State, 471 So.2d 44 (Fla.1985). . . . . . . . 39, 47

Rogers v. State, 954 So. 2d 64 (Fla. 1st DCA 2007). . . . . . 34

Seavey v. State, 8 So. 3d 1175 (Fla. 2d DCA 2009); .. . . 31, 34

State v. Lee, 531 So. 2d (Fla. 1988). . . . . . . . . . . . . 44

State v. Richardson, 621 So. 2d (Fla. 5th DCA 1993).. . . . . 46

Straight v. State, 397 So. 2d (Fla. 1981).. . . . . . . . . . 36

Thomas v. State, 599 So. 2d (Fla. 1st DCA 1992).. . . . . . . 44

Travers v. State, 578 So.2d (Fla. 1st DCA 1991). . . . 39, 46, 47

**STATUTES**

§90.404(2)(b).. . . . . . . . . . . . . . . . . . . . . . . . 46

§90.404(2)(b)(1). . . . . . . . . . . . . . . . . . . . . . . 38

**RULES**

Fla.R.Crim.Pro. 3.111(d)(5. . . . . . . . . . . . . . . . . . 46

Fla.R.Crim.Pro. 3.111(d)(5) . . . . . . . . . . . . . . . . . 46

Florida Rule of Criminal Procedure 3.111(d) . . . 23, 35, 36, 38

Rule 9.140(f).. . . . . . . . . . . . . . . . . . . . . . . . 38

Rule 9.140(f), Florida Rules of Appellate Procedure). . . . . 37

**IN THE DISTRICT COURT OF APPEAL**
**FIRST DISTRICT OF FLORIDA**

**CLIFTON BROOKS,**            :

     Appellant,            :

v.                            :            CASE NO. **1D13-1073**

**STATE OF FLORIDA,**          :

     Appellee.            :

_____/

<u>**AMENDED INITIAL BRIEF OF APPELLANT**</u>

<u>**PRELIMINARY STATEMENT**</u>

This is an appeal from judgment and sentence of sexual battery on a person less than 12 years old and a lewd or lascivious offense on a child less than 12 years old. The trial proceedings were held in the Circuit Court for Duval County, Judge Tatiana Salvador, circuit judge, presiding. Clifton Mc Neil Brooks was the appellant in the trial court and will be referred to in this brief as "appellant," or by his proper name. The record on appeal consists of six volumes. Citations to the record will appear as appropriate volume and page number, e.g., (I,1). Citations to the supplemental record will appear as "Supp".

1

## STATEMENT OF THE CASE

By amended information filed on February 8, 2013, appellant was charged with the offenses of sexual battery on J.M., a person less than 12 years old by placing an object in J. M.'s anus (count one), allegedly occurring between January 3, 2003 and January 2, 2005, lewd or lascivious conduct of J.M., a child less than 12 years old by intentionally touching the breasts, genitals, genital area, or buttocks, or the clothing covering them of J.M., allegedly occurring between January 3, 2004 and January 2, 2005 (count 2), and lewd or lascivious acts, in presence of J.M., a person less than 16 years old by intentionally masturbating in the presence of J. M., allegedly occurring between January 3, 2006 and January 2, 2008 (count 3) (I, 109). A jury found appellant guilty of counts 1 and 2 (I, 120-21); the state conceded that a judgment of acquittal on count 3 was proper (IV, 185-86). The trial court sentenced appellant to life in state prison on both counts, to run concurrently (I, 185-86). Appellant filed a timely amended notice of appeal on February 27, 2013 (II, 383).

2

## STATEMENT OF PRETRIAL MATTERS AND THE FACTS

### Pretrial Hearings- Faretta

On December 4, 2012, a hearing was held before Judge Tyrie Boyer on appellant's initial trial counsel's motion for a continuance (II, 396-397). Defense counsel stated that appellant did not want to waive his right to a speedy trial, however, she was unprepared for trial (id.). Appellant requested a <u>Faretta</u> hearing and requested his current trial counsel, public defender, Ms. Galnor, remain his number two chair "to adopt my motions" (id.). The trial court ordered appellant out of the courtroom because of his "outbursts" (II, 396-97). The trial court said that it "takes judicial notice that the defendant is misbehaving in the courtroom" and reset the case for a later date without ruling on any motions (II, 397).

On December 5, 2012, appellant's trial counsel filed a Second Motion for Continuance and a Suggestion of Mental Incompetence to Proceed (I, 73-79). The Suggestion noted that, based on Ms. Galnor's observations of and conversations with Mr. Brooks, Mr. Brooks exhibited inappropriate behavior in her presence and in the presence of the court; appeared disoriented as to time and place; could not aid in the preparation of his defense; did not appear to appreciate the nature of the charges against him or the range and nature of the possible penalties; did not appear to understand the adversarial nature of the process and her role; that he was unable

3

to provide her with facts surrounding the alleged offenses; that he appeared very agitated, talked to himself, was paranoid and fixated on issues that were unrelated to the case; and, the Suggestion recalled that Mr. Brooks had an outburst in the courtroom on December 4, 2012 (I, 77-78).

A hearing on the two motions was held on December 6, 2012, again before Judge Tyrie Boyer (II, 376-380). Mr. Brooks interrupted Ms. Galnor and the court in his attempts to address the court (II, 376, 378-79).

Counsel stated her belief that appellant was incompetent to proceed based on observing his behavior during visits to the jail to discuss his case (II, 376-78). The trial court voiced its concern based on his observations of appellant's behavior in court on at least three occasions (II, 378). Defense counsel stated that she had an evaluation scheduled for appellant for the following morning (II, 379). The trial court agreed with Ms. Galnor's concerns about Mr. Brooks' competency to proceed (II, 379).[1] The trial court granted the continuance (I, 72; II, 380). The trial court stated that appellant had indicated he wanted to represent himself, however, the court did not think that appellant was competent to represent himself and said that the court would take up the <u>Faretta</u> issue after the evaluation (II, 380).

---

[1]. The trial court did not order appellant be examined to determine his mental competence to proceed and the record does not reflect that an evaluation occurred.

4

Public Defender, Ms. Galnor, withdrew due to a conflict within the Public Defender's Office; the Office of Regional Conflict Counsel was appointed to represent Mr. Brooks (I, 91).

On January 28, 2013, a _Faretta_ hearing was held before a different judge (who handled the case through to sentencing), Judge Tatiana Salvador, newly appointed to the circuit bench, who commenced her judicial duties January 1, 2013 (III, 399-428). Initially, Mr. Brooks stated that he wanted Ms. Galnor to be his "number two chair" (III,403). The trial court explained that the Public Defender's Office had a conflict in representing him so that Ms. Galnor withdrew and could not be his attorney and that was why Mr. Gates from the Office of Regional Conflict Counsel was appointed to represent him (id). Mr. Brooks said that he did not want conflict counsel to represent him, that he could not say anything bad about Mr. Gates and, in response to the trial court's question why he did not want Mr. Gates to represent him, Mr. Brooks said: "I'm really not at liberty to discuss that right now because I don't want to harm my case in any way." (III, 404-05). Mr. Brooks said that he wanted a _Faretta_ hearing and, apparently not understanding what the court had said about Ms. Galnor's inability to represent him, said "If you don't grant it that I want to keep Ms. Galnor. That's all I needed to do." (III, 405).

Appellant thought that he would be given counsel after the _Faretta_ hearing(III, 406). The court explained the process (III,

5

406, 408). After talking with conflict counsel, conflict counsel said that Mr. Brooks wanted stand by counsel (id.).

The trial court conducted a <u>Faretta</u> inquiry (III, 408-424). Appellant said that he understood the trial court's statements about the advantages of having representation, the disadvantages of representing himself, and the penalties he was facing; and that he wanted to represent himself (III, 408-12, 419).

The trial court explained that if he was "disruptive in the courtroom, and again, I haven't met you before, I don't know if this is an issue, but I need to forewarn you that, again, I could terminate your self representation and I could remove you from the courtroom, in which case your trial would continue without your presence. Do you understand?"[2] (III, 414-15). Mr. Brooks questioned what the trial court meant by "disruptive" and the court provided some examples (III, 415).

Mr. Brooks said that he did not have any input from Ms. Galnore; that he did not discuss the charges with her, he received the information in the mail; and, that she gave no information to him, he had nothing on his case (III, 417, 426). The trial court directed the Deputy State's Attorney to send the <u>Williams</u> rule motions to Mr. Brooks (III, 426).

---

[2]Apparently the trial court was unaware of and had not read the Suggestion of Mental Incompetence to Proceed, filed on December 6, 2012 (I, 77-78).

Appellant said that he went to college for about two years (III, 420). Appellant said that he was diagnosed with posttraumatic stress disorder in 2008 and that he did not need medication; his symptoms concerned sleep problems (III, 420-21).

The trial court found appellant competent to waive counsel and allowed him to represent himself (III, 424-25). The court again asked if Mr. Brooks wanted stand-by counsel and he again said that he wanted Ms. Galnor and that if he could not have her he did not want stand-by (III, 423-24).

At the February 4, 2013 pretrial hearing, appellant asserted that Ms. Galnor, his former public defender, violated his attorney client privilege but could not say how she did so except that she instructed the State's attorney to withhold evidence from him (III, 435; 437-38).

The trial court asked appellant if he wanted conflict counsel as backup counsel, which he refused (III, 441-42).

Appellant was of the opinion that he needed to plead to the State's motions (III, 445). Appellant filed orders for 16 material witness bonds and writs of attachment, which included those for the State's Attorney, the Deputy State's Attorney, and appellant's former Public Defender; he also sent notices to these people saying he wanted to sue them (III, 443-44). Mr. Brooks stated that he wanted these people to be witnesses and brought to trial (III, 444). The trial court said that these actions involved separate

7

proceedings from the trial at issue and denied the orders (III, 444-45).

### Williams Rule Evidence Motion Hearing and Order

The State filed two notices of other crimes wrongs or acts evidence (I, 54-55). A hearing on these motions was held on February 8, 2013 (III, 452-471). The first notice concerned L.A., Appellant's best friend's daughter, alleging that when she was 12 or 13 years old appellant forced penile-vaginal intercourse with her (I, 54). The second notice concerned R.H., Appellant's fiancée's sister, alleging that when she was 14 appellant touched her breasts and vagina with his hands underneath and over her clothing (I, 55).

Both at the inception of the hearing and during the hearing the trial court asked appellant if he wanted counsel to represent him, which he declined (III, 453, 469).

R. H., aged 25, testified that when she was 13 years old Mr. Brooks, who is her uncle, took her on a drive to a Walmart store and while in the car touched her on her chest area, on top of her clothes and also touched her on the outside of her vagina under her underwear (III, 457-58). After touching her, he put his hand on his gun (III, 457). She said that he threatened to kill her sister and her nephew if she told anyone (III, 459). At an unknown later time, R.H. told her sister, Shantell Harris, about the incident (III, 460). Shantell Harris has two children with appellant (III, 455).

8

During cross-examination, Mr. Brooks questioned R. H.'s age at the time of the alleged offense and if she recalled the year (she didn't) (III, 461-62). Appellant also inquired as to who made the initial phone call to the police, to which the state's objection was sustained by the court (III, 461).

The State offered depositions of the alleged victim in the instant matter, J.M., Mr. Brooks' niece; Shantell Harris; and, the other alleged <u>Williams</u> rule victim, L. A. (III, 462-63; Supp III). The trial court reviewed the depositions (III, 463).

The state argued that the deposition testimony of L. A. and the live testimony of R. H. showed by clear and convincing proof that the incidents they related occurred (III, 464). The state further argued that the alleged victims were in a familial situation with Mr. Brooks and that the deposition and live testimony showed a pattern of conduct by appellant, who, in a familial context, chose "convenient victims" (III, 466-65). The State also argued that a "relaxed standard of familial cases" should be extended to the instant case (III, 466).

Mr. Brooks argued that there was no proof of the allegations "except for one person, that particular one she just called, and that's Shantell Harris." (III, 467).

Mr. Brooks stated that he did not know how to argue against the <u>Williams</u> rule evidence motion, that he agreed and consented

9

that the witnesses could testify at his trial, and that he would defend himself against them at trial (III, 469).

The trial court found by clear and convincing evidence that the acts alleged in the deposition and through live testimony occurred and were admissible to show proof of motive, opportunity, intent, plan, knowledge or absence of mistake, that the evidence was not substantially outweighed by the danger of unfair prejudice, and ruled that she would give a <u>Williams</u> rule instruction at trial (III, 470).

The trial court issued a written order allowing the State to introduce evidence of other crimes and acts (I, 113-17). The trial court relied on the deposition of the alleged victim in the instant matter, J. M., in which she said that when she was sleeping alone in a bed she felt appellant "mess with my rump" (I, 115). The trial court relied on the deposition of L. A., 23 years old, who testified that when she was 12 years old appellant "raped me," specifically that appellant put his penis in her vagina (I, 116). As to both R.H. and L. A., the trial court found that appellant "spent a great deal of time" around them and their families (id.).

The court specifically found that the collateral acts against R. H. and L. A. were proved by clear and convincing evidence; that the probative value of the evidence of the prior molestations was not substantially outweighed by the danger of unfair prejudice to appellant; and that their testimony reflects "an underlying pattern

10

of molestation" of young females who appellant knows through a "familial setting-similar in age, gender, and familiarity to the victim in the instant case" (I, 116). Furthermore, the trial court found that the allegations of the alleged victim in the instant matter were similar to those of the collateral acts committed against L. A. in that both she and the alleged victim were sleeping in a bed alone when appellant woke them, which pattern showed an absence of mistake or accident (I, 117). The trial court found that the collateral act involving R. H., which occurred in the car, was "not dispositive" on the issue of relevancy, and was probative and relevant to show appellant's intent, opportunity and plan (id.). The trial court indicated that it would instruct the jury on the <u>Williams</u> rule cautionary instruction both before presentation of the testimony and at the conclusion of all evidence (id.).

## **Jury Selection**

Before jury selection, defendant was given the amended information of February 8, 2012 (Supp I, 10). The only change from the original July 30, 2012 information (I, 9), was in count one, in which the dates of the alleged incident were alleged to have occurred between January 3, 2003, and January 2, 2005, rather than between January 3, 2003 and January 2, 2004  (I, 109). Appellant stated that his trial strategy was built around the dates in the prior information (Supp I, 13). The trial court asked Mr. Brooks if he wanted a continuance, which he rejected, and he contradicted his

11

earlier statement by stating that the dates and or the amended information had no bearing on his trial (Supp I, 14).

The trial court informed Mr. Brooks of the protocol of standing when addressing the court at which point the court noted that he was laughing and giggling (Supp I, 28). Mr. Brooks informed the court that he was a "naturally happy guy." (Supp I, 29). The trial court introduced Mr. Brooks to the venire and he responded by saying "Hi. What's happening?" (Supp I, 39).

### Trial (February 13, 2013)

On the morning of trial, the court asked Mr. Brooks if he wanted counsel, or back up counsel, and again appellant stated that he wanted his former public defender, Ms. Galnor, as his attorney and if he could not have her represent him that he'd proceed pro se (IV, 5-6). The trial court acknowledged that numerous times she had informed him that the Public Defender Office had a conflict and thus could not represent him and that he continued to request Ms. Galnor as counsel and questioned whether he understood that circumstance (IV, 6). Appellant said that he understood. (Id).

Mr. Brooks sought to introduce his Operation Enduring Freedom orders to establish the time frame when he was out of the country with respect to the dates in the original information (IV, 9-11). Mr. Brooks appeared not understand the lack of relevance of the military orders to the amended information as it was explained by the trial court (IV, 12).

12

Mr. Brooks sought to introduce the police incident report of December 5, 2004, which described an altercation with Shantell Harris (IV, 20-21). Mr. Brooks also wanted to introduce a March 8, 2006 permanent injunction by Shantell Harris against him (IV, 27-29). The court explained to Mr. Brooks that with the introduction of these documents the jury would hear prior bad acts incriminating him, which Mr. Brooks responded, "Fine. No problem" (IV, 29).

Mr. Brooks wanted to call as his witnesses the State's Attorney's office Division Director, the person who notarize the information, the State's attorney, his former public defender Ms. Galnor, the Deputy State's attorney prosecuting the case, among others (IV, 45-47). Mr. Brooks that he gave this list to Ms. Galnor (IV, 47). The trial court ruled that the government officials he listed could not be called as witnesses but as to the others she asked if he wanted continuance to get them subpoenaed (IV, 48-50). Mr. Brooks said that he did not want a continuance, but that he was denied his witnesses by the public defender's office because Ms. Galnore did not seek to obtain these witnesses (IV, 51). The trial court again told Mr. Brooks if he wanted his witnesses for his trial that she would give him an option of a continuance, however, Mr. Brooks said he wanted to go forward, and not continue his case (IV,54-55). In reaction to something not transcribed, the trial court said, "This is not a joke, Mr. Brooks." Mr. Brooks replied, "Well, it is kind of, but-" (IV, 56).

13

During opening, the prosecutor argued that the jury would hear from the victim's mother, Shantell Harris, who would testify that when J. M., was 8 years old, she was seated on the defendant's lap and he tickled her on her thighs and vagina (IV, 70). They would also hear R. H. describe another incident where she caught Mr. Brooks in J. M.'s bedroom with his hand "cover up, going." (Id.)

The prosecutor also stated that R. H. and L. A. would testify about incidents that occurred with appellant, specifically, they would hear R. H.'s testimony that the defendant fondled her and threatened her and L. A.'s testimony that the defendant forced her to have sex with him (IV, 71).

Mr. Brooks opening was as follows: "Good morning, everyone. United States box laborer in 1865, but they continue a psychological and physical instruction of containing, a foolproof method for containing and creating–" (IV, 71). The State objected and the trial court sustained the objection (id.). Trial court explained to Mr. Brooks the purpose of opening statement (IV, 71-72). Mr. Brooks then said: "Okay. What you will see in this courtroom throughout my trial is all statements from witnesses except by police officers that did not investigate what they were saying or said; State's attorneys who make the lies work; a public defender that provide client information to the State's attorney for–" (IV, 72). The State objected, and the trial court told Mr. Brooks that reference to public defender was improper (id.). Mr.

14

Brooks then stated, "And in the end, you will find that I'm innocent." (IV, 73).

J. M., age 17, testified that Mr. Brooks is her uncle (IV, 74). She testified that between 2003 and 2005, when she was 7 or 8 years old, she was living with her mother, her brother, and appellant (IV, 75-76). During that time there was a night when she was in her room asleep and she woke up with Mr. Brooks laying behind her and inserting something in her butt (IV, 77-78). Before this incident occurred, she noticed that Mr. Brooks had a toy in his hand (IV, 78). At that time she did not tell anybody about the incident (id.).

The second incident with Mr. Brooks occurred when she was around 10 years old ; at that time she was living a different house with her mother, her 2 brothers and appellant (IV, 78-79). The second incident involved Mr. Brooks exposing his penis to her (IV, 80). At that time she did not tell anybody about the incident (id.).

The third incident with Mr. Brooks occurred when she was around the same age 10 or 11 (IV, 80-81). The third incident involved Mr. Brooks again exposing himself to her (IV, 81). At that point she told Mr. Brooks that she was going to tell her mother, which she did, and she and her siblings left the house and her mother contacted the police (IV, 81-82).

15

Shortly after her 16th birthday she told her mother about the first incident (IV, 82-83).

Mr. Brooks requested to reserve the right to call back the witnesses and declined to cross-examine J. M. (IV, 83-84).

Ms. Shantell Harris testified that Mr. Brooks is the father of her children (IV, 85). She testified that when J. M. was about 8 years old there was an occasion when she and Mr. Brooks brought her to Mr. Brooks' house where she observed Mr. Brooks tickling J. M. between her legs on and her thighs and on her vagina (IV, 86-87). She said that she told Mr. Brooks to stop, and he said that J. M. liked it and kept on doing it (IV, 87).

Shantell Harris described another instant between Mr. Brooks and J. M. in which one night she noticed that twice he returned to their bed aroused after going to check on J. M. and her twin brother (IV, 87-88). The third time he got up she followed him and went to where J. M. and her brother were sleeping and noticed that his hand was under the covers between J. M.'s legs (IV, 88).

During cross-examination, Shantell Harris could not recall the year in which the first incident occurred (IV, 95). Mr. Brooks attempted to use a December 13 deposition to assist her recollection, but before he could do so the State requested a sidebar, at which point the prosecutor pointed out that the deposition reference to when the incident happened also referenced a pistol whipping incident and other bad acts that preceded it (IV,

95-96). The state said that appellant was arrested in 2006 for the pistol whipping incident (IV, 96).

The trial court explained to Mr. Brooks that if he questioned Ms. Harris about what she said in her deposition about the sequence of the incident as it related to the pistol whipping incident that the State could ask questions about the pistol whipping incident and acts that preceded it, which would be to his disadvantage. (IV, 98). Appellant said that Ms Harris testified in her deposition that the tickling incident happened before the pistol whipping incident, which he said occurred in 2004; the court said that the pages Mr. Brooks referred to in Ms Harris' deposition did not reveal when the pistol whipping incident occurred, but that it was his decision whether to proceed with this line of questioning (IV, 96-98).

When Mr. Brooks asked Ms. Harris if it was correct that in her deposition she stated that the tickling incident occurred before the pistol whipping incident, she agreed that it had (IV, 101). Mr. Brooks asked Ms. Harris to explain the pistol whipping incident and Ms. Harris responded that she called Mr. Brooks to come pick up the children and when he arrived she asked him about a hickey on his neck to which Mr. Brooks told her that J. M. did it (IV, 103). Ms. Harris testified that J. M. was 8 years old at the time of the pistol whipping incident, which occurred within the time frame of 2004 or 2005 (Id.).

17

Ms. Harris testified that Mr. Brooks went into the military and to Iraq in 2002 or 2003 (IV, 105-06).

On redirect, the prosecutor elicited that Mr. Brooks pistol whipped Ms. Harris when she confronted him about the hickey on his neck that he said J. M. put there and that she contacted the police when she was pistol whipped and told them what happened, which was in 2006 (IV, 112).

Detective Collins, of the Jacksonville sheriff's office interviewed J. M. (IV, 121). Collins also interviewed Mr. Brooks (IV, 123).

During cross-examination, Mr. Brooks wanted to introduce the original information, which the court denied (IV, 128). The Detective testified that J. M. gave her age as 7 when the initial incident occurred (IV, 130). Mr. Brooks asked the detective what J. M. had said to him about the second and third incidents, to which he responded that Brooks exposed his penis to her on each occasion (IV, 131). Mr. Brooks wanted to introduce the amended information, which the court denied (IV, 133-34). Mr. Brooks questioned Detective Collins as to what Shantell Harris had told him about his case (IV, 136-37). Collins said that Ms. Harris told him that she saw an occasion where Mr. Brooks was tickling J. M. on top of her vagina or on her vagina over her clothing (IV, 137).

Mr. Brooks inquired of Collins as to his interview with Ms. Harris's sister, R. H. (IV, 137). Collins said that R. H. told her

that when she was 14 years old Mr. Brooks asked her to have sex with him, she refused, then Mr. Brooks rubbed her breasts and her vagina over and under her clothing, at which time she began to cry (IV, 138). This incident occurred during a car ride to Walmart (id.). Collins related that R. H. told him that Mr. Brooks told her that he would kill her sister and her nephew and she was not to tell anybody what happened (id.). Collins testified that Mr. Brooks admitted to him that he took R. H. to Walmart (IV, 139). At sidebar, Mr. Brooks said that he wanted to introduce the DVD interview that he had with Detective Collins in which the R. H. incident was discussed because it would show that he did not tell Collins that he took R. H. to Walmart (IV, 140, 142). The court explained that by introducing the DVD he was making Williams rule evidence a feature of the trial, which would be overly prejudicial to him; the trial court left the decision up to him (IV, 141). A discussion ensued as to the rule of completeness in terms of introducing a section of the DVD when Mr. Brooks dropped his request about introducing the DVD and inquired about introducing the title to his car, which the trial court allowed (IV, 143).

Prior to R. H.'s testimony, the trial court read to the jury the limiting Williams rule instruction (IV, 148). R.H. testified that she is 25 years old (IV, 149). R. H. is Shantell Harris's sister (IV, 149). R. H. testified that when she was 13 years old Mr. Brooks drove her to Walmart, that he had a gun with him, that

19

he touched her breasts and on her vagina under her clothes, and that he told her that if she told anyone he would kill her sister and her nephew (IV, 151-52). She did not tell anyone immediately after the incident because she was scared (IV, 152-53).

During cross examination, she said that her sister reported to the police what happened to her (IV, 154). R. H. said she was in 7th grade when she was 13 and it was in 2000 that the Walmart incident occurred (IV, 156).

Mr. Brooks wanted the court to hold R. H. in contempt for perjury because she said she was 13 years old at the time of the incident and there was paperwork that indicated that she was 14 (IV, 159). The court declined to hold her in contempt (IV, 160-61).

Before L. A. testified the court read to the jury the limiting Williams rule instruction (IV, 162-63). L. A. testified that she is 23, (IV, 163). L. A. testified that Mr. Brooks was her mother's best friend (IV, 164). L. A. testified that when she was 12 years old and sleeping in her mother's bedroom Mr. Brooks had sexual intercourse with her (IV, 165). She testified that he told her that if she would tell anyone he would hurt everybody (IV, 165). She testified that when she was 19 years old she told her grandmother about the incident (IV, 166). L. A. testified that another incident occurred when she was 14 years old when Mr. Brooks rubbed her arm, but someone was coming so he stopped (IV, 166-67). L. A. started crying while testifying (IV, 167).

20

During cross-examination, Ms. Alexander agreed that Mr. Brooks was in the military (IV, 167-68).

The State rested (IV, 174). Mr. Brooks declined to testify (IV, 177). Mr. Brooks had requested all the State's witnesses be subject to recall but because his exhibits were not allowed into evidence and his questions were based on those exhibits he was unsure of what questions he would ask of the witnesses (IV, 179-80). The trial court stated that the exhibits that were not admitted were the first information, the current information and the police reports (IV, 179-80). Mr. Brooks said that these exhibits and his questions based on these exhibits would contradict the witnesses' testimony (IV, 180). As an example, Mr. Brooks explained that the documents that were not allowed into evidence would show that L. A. was living with her grandmother at a time that he was in jail, the grandmother was listed as a witness (IV, 182).

Mr. Brooks explained because his questions corresponded to his exhibits and the exhibits were not allowed into evidence, he didn't have any witnesses to call (IV, 182-83).

The State agreed that had Mr. Brooks moved for judgment of acquittal on count 3, the State would have conceded and the court granted a judgment of acquittal on 3 (IV, 185-86). The court also stated that although Mr. Brooks did not move for a judgment of acquittal the court found that a prima facie case had been made by

21

the State as to counts 1 and 2 (IV, 186). The court conferred with Mr. Brooks, and the State as to the jury instructions, which included the Williams jury instruction as to evidence of other crimes, wrongs or acts (IV, 187-193). Mr. Brooks agreed to the instructions (IV, 195). The defense rested (IV, 199).

During closing, the state referred to the Williams rule evidence (V, 211-13). As well, with respect to count 2, the prosecutor said that Shantell Harris testified to observing Mr. Brooks tickling J. M. on her breasts as well as her legs and vaginal area (V, 206-07). The prosecutor also reminded the jury that Shantell Harris testified that Mr. Brooks placed his hand underneath J. M.'s bedcovers (V, 207, 211-12).

On February 27, 2013, before sentencing, the trial court did not ask Mr. Brooks if he wanted counsel.

22

## SUMMARY OF THE ARGUMENT

With respect to issue number one, the trial court erred in finding appellant understood the offer of counsel and its waiver. The trial court failed to conduct a thorough <u>Faretta</u> inquiry. The trial court was unaware of the Suggestion of Mental Incompetency to Proceed in the court's file. Appellant did not have an understanding of why he could not be represented by the Public Defender's Office. Appellant did not have an understanding of his case. Under the circumstances, the trial court erred in ruling appellant competent to represent himself.

With respect to issue number two, the trial court failed to order sua sponte a competency evaluation. Appellant, appearing pro se, exhibited instances of erratic and irrational behavior throughout the proceedings and on one occasion bizarre behavior by reciting gibberish as his opening argument. It is apparent from the record that there was a bona fide doubt that appellant had the mental capacity to represent himself and reasonable grounds to believe that Appellant's mental capacity was such that he was incompetent and that a competency evaluation was warranted. <u>Barnes v. State,</u> 124 So.3d 904 (Fla. 2013).

With respect to issue number three, during the <u>Williams</u> rule hearing, the trial court erroneously found that the allegations of prior sexual acts committed by Appellant against R. H. and L. A. were substantially similar to the allegations in the deposition of

23

J.M., the alleged victim in this case. The trial court erroneously found that the probative value of the evidence of allegations of prior sexual crimes against R.H. and L.A. were not substantially outweighed by the danger of unfair prejudice to appellant. During the trial, three additional instances of prior, collateral crimes of a sexual nature were admitted: J.M. testified that appellant exposed his penis to her on two occasions and Shantell Harris testified that appellant put his hand between J.M.'s legs when she was sleeping. Excessive evidence of other sexual crimes became a feature of the trial and constitutes fundamental error. This case is an instance where the interests of justice demand that the error be ruled fundamental because it reaches to the very core of the trial.

With respect to issue number four, after accepting appellant's waiver of his right to counsel and allowing him to proceed pro se, the trial court failed to conduct another <u>Faretta</u> inquiry before imposing sentence. Failure to conduct a <u>Faretta</u> hearing before imposing sentence is reversible error.

' ,

## ARGUMENT

## I. The trial court failed to sufficiently conduct the Faretta inquiry with respect to appellant's competency to represent himself.

### Standard of Review

The decision to allow a defendant to represent him or herself is reviewed under an abuse of discretion standard. Mora v. State, 814 So.2d 322 (Fla. 2002).

### Facts

On January 28, 2013, a Faretta hearing was held before Judge Tatiana Salvador[3]; Regional Conflict Counsel, Mr. Gates, was present (III, 399-428). Appellant stated that he wanted Ms. Galnor to be his "number two chair" (III,403). The trial court explained that the Public Defender's Office had a conflict in representing him so that Ms. Galnor could not remain as his attorney and that was why Mr. Gates was appointed to represent him (id). Mr. Brooks said that he did not want conflict counsel to represent him, and, in response to the trial court's question why he did not want Mr. Gates to represent him, Mr. Brooks said "I'm really not at liberty to discuss that right now because I don't want to harm my case in any way." (III, 404-05). Mr. Brooks said that he wanted a Faretta

_____

[3]Judge Salvador had been appointed to the bench November, 2012, and began her judicial duties January 8, 2013.

25

hearing and that "If you don't grant it that I want to keep Ms. Galnor. That's all I needed to do." (III, 405).

Appellant did not understand the reason for a <u>Faretta</u> hearing; he thought that he would be given counsel (III, 406). The court explained the process (III, 406, 408). After talking with conflict counsel, conflict counsel said that Appellant wanted stand by counsel, and only Ms. Galnor as stand-by counsel (III, 406, 424).

The trial court conducted a <u>Faretta</u> inquiry (III, 408-424). Appellant said that he understood the trial court's statements about the advantages of having representation, the disadvantages of representing himself, the penalties he was facing; and, said that he wanted to represent himself (III, 408-12, 419).

The trial court explained that if he was "disruptive in the courtroom, and again, I haven't met you before, I don't know if this is an issue, but I need to forewarn you that, again, I could terminate your self representation and I could remove you from the courtroom, in which case your trial would continue without your presence. Do you understand?" (III, 414-15). Mr. Brooks questioned what the trial court meant by "disruptive" (III, 415). The court explained that that would mean "not following the Rules of Court and procedure, speaking out of turn, yelling, screaming. Certainly, being rude and disruptive to words the witnesses or towards the jurors or towards the attorneys." (III, 415).

Mr. Brooks said that he did not have any input from Ms. Galnore; that he did not discuss the charges with her, he received the information in the mail; and, that she gave no information to him, he had nothing on his case (III, 417, 426).

Appellant said that he went to college for about two years (III, 420). Appellant said that he was diagnosed with posttraumatic stress disorder in 2008 and that he did not need medication; his symptoms concerned sleep problems (III, 420-21).

The trial court found appellant competent to waive counsel and allowed him to represent himself (III, 424-25). The court again asked if Mr. Brooks wanted stand-by counsel and he said that he wanted Ms. Galnor and that if he could not have her he did not want stand-by (III, 423-24).

### Discussion

A defendant shall not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused's comprehension of that offer and the accused's capacity to make an intelligent and understanding waiver. Hill v. State, 688 So.2d 901 (Fla. 1996). The key factor in self-representation is the knowing and intelligent waiver of both the right to counsel and the benefits associated with representation by counsel. Faretta v. California, 422 U.S. 806 (1975). The focus of the Faretta inquiry is whether the defendant is competent to waive counsel, not whether

27

he or she is competent to provide an adequate defense. <u>Kearse v.</u> <u>State,</u> 858 So.2d 348 (Fla. 1st DCA 2003). The Supreme Court has recognized that exercising the right to self-representation requires a greater level of mental competence than the level of competence necessary to stand trial. See <u>Indiana v. Edwards,</u> 554 U.S. 164 (2008).

In <u>Faretta,</u> the record revealed that the defendant "was literate, <u>competent, and understanding,</u> and that he was voluntarily exercising his informed free will" (emphasis supplied). <u>Id.</u> at 835.

Florida Rule of Criminal Procedure 3.111(d) provides in pertinent part

> (d) Waiver of Counsel.
> ***
> (2) A defendant shall not be considered to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused's comprehension of that offer and the accused's capacity to make a knowing and intelligent waiver. Before determining whether the waiver is knowing and intelligent, the court shall advise the defendant of the disadvantages and dangers of self-representation.
>
> (3) Regardless of the defendant's legal skills or the complexity of the case, the court shall not deny a defendant's unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel, and does not suffer from severe mental illness to the point where the defendant is not competent to conduct trial proceedings by himself or herself.

28

In the case at bar, the trial court failed to conduct the "thorough inquiry" that Rule 3.11(d) requires into "both the accused's comprehension of that offer [of counsel], and the accused's capacity to make a knowing and intelligent waiver." Had the trial court conducted a thorough inquiry it would have ruled that Mr. Brooks was not competent to waive counsel. A thorough inquiry would have included a review of the court's file and docket entries that included information about the two hearings of December 4 and 6, 2012, before Judge Boyers, and the Suggestion of Mental Incompetence to Proceed of December, 5 2012 (I, 77-79).

Had the trial court read the Suggestion of Mental Incompetence to Proceed before or during its January 28, 2013, <u>Faretta</u> inquiry, it would have learned about Mr. Brooks' recent history of inappropriate behavior in the presence of Mr. Galnore and Judge Boyers and it would have been alerted to conduct a "thorough inquiry" into Mr. Brooks' comprehension of offering counsel and capacity to making an understanding waiver.

The record of the <u>Faretta</u> hearing reveals that even after the trial court a number of times had explained to Mr. Brooks that the Public Defender had a conflict and therefore Ms. Galnore couldn't represent him and that the Office of Regional Conflict Counsel could continue to represent him, Mr. Brooks repeated his request for Ms. Galnor to represent him (III, 404-05, 423-24).

Mr. Brooks said that he did not have any input from Ms. Galnor; that he did not discuss the charges with her, he received the information in the mail; and, that she gave no information to him, he had nothing on his case (III, 417, 426).

Given Mr. Brooks' failure to understand that Ms. Galnor could not represent him and his admission that he knew nothing about his case, it cannot be said that he understood the offer of counsel and its waiver.

In <u>Moore v. State,</u> 615 So.2d 874 (Fla. 1 DCA 1993), this court held that the trial court failed to conduct a sufficiently thorough inquiry with respect to the defendant's decision to represent himself at trial and reversed and remanded the case for a new trial on the basis that "the inquiry fell short of that which is mandated." <u>Id.</u> Likewise, in the case at bar, the record of the <u>Faretta</u> hearing and the earlier filed Suggestion of Mental Incompetence to Proceed shows that "the inquiry fell short of that which is mandated" and does not support the trial court's conclusion that Mr. Brooks was competent to make the decision to represent himself. Furthermore, although our legal system grants that trial courts are often the best able to make the ultimate mental capacity decision, <u>Indiana v. Edwards,</u> 554 U.S. at 177, they are not infallible. In the instant matter, the trial court was newly appointed and had been sitting on the bench for only a few weeks. Under these circumstances, the court's lack of experience

30

and inadequate inquiry led to its erroneous conclusion that Mr. Brooks was competent to represent himself. A new trial, preceded by a competency evaluation and inquiry is required.

## **II. The trial court fundamentally erred in failing to order a competency evaluation sua sponte despite information throughout the proceedings that raised a bona fide doubt as to appellant's competency.**

### **Standard of review**

The standard of review is abuse of discretion. <u>Robertson v. State,</u> 699 So.2d 1343 (Fla.1997), receded from on other grounds in <u>Delgado v. State,</u> 776 So.2d 233 (Fla.2000).

### **Facts**

The record discloses that a Suggestion of Mental Incompetence was filed on December 26, 2012 (I, 77-79). The Suggestion revealed that Mr. Brooks exhibited behavior in the presence of his public defender and before the predecessor judge that created strong doubt as to his competency to proceed.

During the <u>Faretta</u> hearing, despite Mr. Brooks saying that he understood that Ms. Galnor could not represent him, it is evident that he did not understand because he insisted on her as trial counsel, or standby counsel (III, 404-05, 407-08, 423-24).

During a pretrial hearing on February 4, 2013, Brooks said that Ms. Galnor violated his attorney client privilege by telling the prosecutor to withhold information from him (III, 435,437-38).

31

During the <u>Williams</u> rule hearing, Mr. Brooks only asked two questions of the live witness Ms. Harris, one of which was her age at the time of the alleged incident, which she gave on direct (III, 461). Mr. Brooks admitted that he could not argue against the admission of the collateral acts (III, 469).

During jury selection, Mr. Brooks appeared confused, contradicted himself and exhibited inappropriate behavior (Supp I, 14, 28, 39).

On the morning of trial, before the jury entered the courtroom, Mr. Brooks again asked for his former public defender to represent him (IV, 5-6). Mr. Brooks irrational behavior included a failure to understand that his proposed exhibits were irrelevant to the amended information (IV, 9-11). Mr. Brooks failed to comprehend the significance of the jury hearing evidence of prior bad acts- he did not think it was detrimental that the jury hear that there was a permanent injunction against him by Ms. Shantel Harris as the result of an incident when she accused him of pistol whipping her (IV, 27-29). Mr. Brooks appeared confused: he wanted certain witnesses but didn't want a continuance so that they could be brought to trial (IV, 54-55). Brooks blamed Ms. Galnor for not obtaining his witnesses (Id.). Mr. Brooks exhibited inappropriate behavior, which the court said showed that Mr. Brooks didn't understand the seriousness of trial (IV, 56).

Mr. Brooks opening statement was gibberish (IV, 71).

During trial, Mr. Brooks behavior was erratic: at times he appeared confused and unable to understand the court process or that his requests for the admission of certain evidence would be prejudicial to him. For example, even after the trial court explained to Mr. Brooks the prejudicial effect further inquiry would have of his line of questions for Ms. Harris-when he pistol whipped Ms. Harris and about other inappropriate sexual behavior with J. M. she testified he admitted to her- Mr. Brooks persisted in his questions (IV, 98). Another example of his erratic behavior was when he sought to introduce the DVD of his interview with Detective Collins and then asked to admit the title to his car (IV, 141, 143).

When asked if he wanted counsel or standby counsel, Mr. Brooks requested that his former public defender represent him, although he also accused her of requesting the State to withhold evidence (III, 435, 437-38), and of providing information to the State (IV, 72).

Mr. Brooks wanted to admit his exhibits-the original and amended information and the police report-to disprove the evidence against him (IV, 160-61, 11, 77-180, 182-83).

### Discussion

Due process requires that a criminal defendant when appearing pro se have a rational and factual understanding of the proceedings against him. See <u>Dusky v. United States,</u> 362 U.S. 402

33

(1960); <u>Robertson v. State</u>, 699 So.2d 1343 (Fla.1997), receded from on other grounds in <u>Delgado v. State</u>, 776 So.2d 233 (Fla.2000); <u>Hill v. State</u>, 473 So. 2d 1253 (Fla. 1985). Even when the defendant is competent at the beginning of trial, the court must be alert to circumstances suggesting the defendant is not competent. <u>Drope v. Missouri</u>, 420 U.S. 162, 181 (1975).

The trial court has a duty to conduct a competency evaluation on its own motion when the court has reason to doubt the defendant's competency. "Where the evidence raises a 'bona fide doubt' as to a defendant's competency to stand trial, the judge on his own motion . . . must conduct a sanity hearing." <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966); <u>Nowitzke v. State</u>, 572 So. 2d 1346, 1349 (Fla. 1990); <u>Hill</u>, 473 So.2d at 1256. Under Florida law, a trial court has an independent duty to hold a competency hearing "when there is evidence that a defendant *may* be incompetent to stand trial, not that he or she *is* incompetent." <u>Rogers v. State</u>, 954 So. 2d 64, 65 (Fla. 1st DCA 2007)(emphasis in original). Where, as in this case, there were reasonable grounds to doubt Mr. Brooks' competency, the trial court's failure to suspend the proceedings for a competency evaluation requires a new trial. <u>Pate</u>, 383 U.S. at 386; <u>Rogers</u> at 65. As a matter of law, competency to stand trial cannot be determined retrospectively. <u>Drope</u>, 420 U.S. at 183; <u>Pate</u>, 383 U.S. at 386-87.

Although our legal system grants that trial courts are often the best able to make the ultimate mental capacity decision, Indiana v. Edwards, 554 U.S. at 177, they are not infallible. In the instant matter, the trial judge was newly appointed and had been sitting on the bench for only a few weeks. Under these circumstances, the court's lack of experience led to its failure to order a competency evaluation sua sponte during the proceedings on the occasions when appellant's behavior indicated a doubt that he was competent to proceed.

Recently the Florida Supreme Court had occasion to discuss the circumstances under which a trial court sua sponte should order a competency hearing. In Barnes v. State, 124 So.3d 904, 912 (Fla. 2013), as revised on denial of reh'g (Oct. 17, 2013), the court ruled that the governing standard was "whether any information coming before the court, before or during trial, provided reasonable ground to believe that the defendant's mental condition was such that he was incompetent."

In Barnes, the defendant claimed the trial court sua sponte was required to order a competency evaluation after a Faretta inquiry and before allowing him to plead guilty. Id. at 911. Although his claim was procedurally barred, the Florida Supreme Court reviewed it on the merits and  stated that a "reading of the hearing transcript relied on by Barnes as evidence that the trial court should have ordered a competency determination shows that

35

nothing Barnes said or did in that hearing would provide a reasonable ground for the court to believe he was incompetent to proceed." Id. at 912. The Florida Supreme Court also examined the proceedings subsequent to Faretta and ruled that the record showed there were no facts whatsoever to "reasonably have caused the court to doubt that Barnes was competent." Id. at 913. Specifically, although Mr. Barnes was hospitalized briefly under the Baker Act and had a personality disorder, the record showed that he filed motions, made objections, and comported himself well during all court proceedings. Id. In Barnes, "the trial court record supports the trial judge's conclusion that Barnes was intelligent, understood court procedure, and was completely capable of representing himself." Id. at 912. Unlike the record in Barnes, a review of the entire record in the instant case shows numerous examples of evidence of Brooks's bizarre, irrational, and erratic behavior. Although intelligent, Brooks did not or could not understand court procedure and was incapable of representing himself.

In Molina v. State, 946 So.2d 1103, 1104 (Fla. 5th DCA 2006), the defendant was found incompetent by the trial court then declared competent by evaluation, however, a competency hearing was not held, and he proceeded to trial. During voir dire, Molina expressed vulgarities and obscenities toward the trial court at which time he was held in contempt, sentenced, the jury dismissed,

the trial was continued at a later date. Id. at 1105. The Fifth District held that even if Molina had been properly found competent to proceed his prior adjudication of incompetency and his bizarre behavior during the first trial should have given the trial court reasonable grounds to believe he was incompetent, requiring "further inquiry". Id. at 1106. The court reversed for new trial on determination that he was competent to stand trial. See also Culbreath v. State, 903 So.2d 338, 340(Fla. 2005) (defense counsel's inability to communicate with defendant and defendant's suicide attempt called into question whether he had a rational understanding of the proceedings against him so that the trial court should have ordered a competency evaluation; the failure to do so was error).

The record in the case at bar shows evidence of Brooks' lack of consistent rational behavior, and an incomplete comprehension of the court process and procedure and the consequences of his actions, including most damningly, his requests that evidence prejudicial to him be admitted. There are also clear examples of irrational and bizarre behavior, for example, his opening statement. The record shows Mr. Brooks' erratic behavior, as evidenced by vacillating between an ability to ask questions of witnesses, make objections, and respond to the trial court's questions, and a total failure to understand the prejudice he generated against him by many of his questions of witnesses.

37

Indeed, there were a fair number of occasions during the proceedings when Mr. Brooks exhibited behavior that indicated he may be incompetent and that provided reasonable grounds to the trial court to believe that he may be incompetent. <u>Barnes.</u> The court should have suspended the proceedings and ordered a competency evaluation. The trial court failed to act on its own independent duty to hold a competency hearing. The trial court's failure to suspend the proceedings for a competency evaluation requires a new trial.

### III. <u>The trial court erred in admitting collateral acts of a sexual nature and this evidence became a feature of the trial.</u>

#### Standard of Review and Preservation

A trial court's decision on the admissibility of the evidence is reviewed under an abuse of discretion standard. <u>Hudson v. State,</u> 992 So.2d 96, 107 (Fla. 2008). That discretion, however, is limited by the rules of evidence (id.), see also <u>Harris v. State,</u> 34 So.3d 187, 190 (Fla. 1st DCA 2010), and its legal conclusions are reviewed <em>de novo</em>. <u>Pantoja v. State,</u> 59 So.3d 1092, 1095 (Fla. 2011); <u>Almond v. State,</u> 1 So.3d 1274, 1276 (Fla. 1st DCA 2009)(citing <u>McCray v. State,</u> 919 So.2d 647, 649 (Fla. 1st DCA 2006)).

This issue is preserved as to the <u>Williams</u> rule notice evidence involving R. H.'s and L. A.'s allegations because the

38

trial court did not accept appellant's stipulation and, in effect, treated it as an objection.(III, 469). If ruled otherwise, then admission must be considered fundamental error. _Travers v. State_, 578 So.2d 793, 797 (Fla. 1st DCA 1991). As to the other collateral uncharged crimes evidence introduced by Shantell Harris and J.M, it was fundamental error for the trial court to have permitted the jury to consider this evidence._ Travers,_ (citing also to _Dydek v. State,_ 400 So.2d 1255 (Fla. 2d DCA 1981) (appellate court may consider fundamental error not raised below nor argued on appeal); _Robinson v. State,_ 462 So.2d 471 (Fla. 1st DCA 1984), rev. denied, 471 So.2d 44 (Fla.1985) (reversal for "fundamental injustice" under Rule 9.140(f), Florida Rules of Appellate Procedure)).

### Facts

On February 8, 2013, the trial court held a _Williams_ rule hearing on the State's two Notices of Other Crimes, Wrongs or Acts (I, 54-55). (Mr. Brooks appeared pro se.) The court heard live testimony of R. H. and considered testimony through deposition of the alleged victim in the case, J. M., and of L. A.

Mr. Brooks was charged with one count of sexual assault on J.M., allegedly occurring on or between Jan. 3, 2003 and Jan. 2, 2005, by placing an object in her anus; one count of lewd and lascivious conduct allegedly occurring on or between Jan.3 ,2004 and Jan. 2, 2005, by intentionally touching J.M.'s breasts, genitals, genital area, or buttocks or the clothing covering them;

39

and one count of masturbation in J.M.'s presence, allegedly occurring on or between Jan. 3, 2006 and Jan. 2, 2008 (I, 109).

J.M.'s deposition testimony related that when she was sleeping alone Appellant "messed with her rump" and that on two occasions appellant exposed his penis to her (Supp III, 42, 46). R. H. testified that, 12 years ago (2001), when she was 13 years old, she was riding alone with appellant in his car when appellant touched her on her breasts, over her clothes, and touched her vagina, both over and under her clothes (IV, 151-52). L. A.'s deposition testimony related that, 11 years ago (2002), when she was 12 years old, appellant had sexual intercourse with her when she was in her bed at her home (Supp III, 70-71,74).

During the hearing, the State argued that the deposition testimony of L. A. and live testimony of R. H. showed by clear and convincing proof that the incidents they related occurred (III, 464). The state further argued that the alleged victims were in a familial situation with Mr. Brooks and that the deposition and live testimony showed a pattern of conduct by appellant, who, in a familial context, chose "convenient victims" (III, 466-65). The State also argued that a "relaxed standard of familial cases" should be extended to the instant case (III, 466).

Mr. Brooks stated that he did not know how to argue against the Williams rule evidence motion, agreed and consented that the

40

witnesses could testify at his trial, and said that he would defend himself against them at trial (III, 469).

The trial court found that the acts alleged in the deposition and through live testimony were clear and convincing evidence that the acts occurred and were admissible to show proof of motive, opportunity, intent, plan, knowledge or absence of mistake; that the evidence was not substantially outweighed by the danger of unfair prejudice; and the court ruled that she would give a Williams rule instruction at trial (III, 470). The trial court issued a written order allowing the State to introduce evidence of other crimes and acts (I, 113-17).

The court specifically found that the R.H. and L.A. testimony reflects "an underlying pattern of molestation" of young females who appellant knows through a "familial setting-similar in age, gender, and familiarity to the victim in the instant case" (I, 116). Furthermore, the trial court found that the allegations of the alleged victim in the instant matter were similar to those of the collateral acts committed against L. A. in that both she and the alleged victim were sleeping in a bed alone when appellant woke them, which pattern showed an absence of mistake or accident (I, 117). The trial court found that the collateral act involving R. H., which occurred in the car, was "not dispositive" on the issue of relevancy, and was probative and relevant to show appellant's intent, opportunity and plan (id.). The trial court indicated that

41

it would instruct the jury on the <u>Williams</u> rule cautionary instruction both before presentation of the testimony and at the conclusion of all evidence (id.).

Count 2, alleging the lewd and lascivious touching offense, is in the singular (I, 109). However, the State argued in its opening and closing and presented evidence during trial to two acts of lewd and lascivious touching, the first involving when Shantell Harris observed Mr. Brooks allegedly tickling J. M. between her legs on her thighs and on her vagina (IV, 86-87,), and the second, when Shantell Harris observed appellant with his hand under J.M.'s bedcovers when she was sleeping (IV, 70, 88; V, 207). J.M. testified to two uncharged collateral acts, alleging that Mr. Brooks exposed his penis to her on two occasions (IV, 80-81).

### Discussion

The trial court relied on §90.404(2)(b)(1), which addresses the admissibility of <u>Williams</u> rule evidence in child molestation cases:

> In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

§ 90.404(2)(b)(1), (2010). The trial court also relied on <u>McLean v. State,</u> 934 So.2d 1248 (Fla.2006).

42

In McLean at 1256, the Florida Supreme Court ruled that trial courts must follow a proscribed procedure to determine whether collateral crime evidence should be admitted under §90.404(2)(b). First, the trial court must determine whether the prior, collateral acts were proven by clear and convincing evidence. The trial court must also ensure that the probative value of the collateral crimes evidence is not substantially outweighed by the danger of unfair prejudice. Id. at 1257. To determine whether the probative value of evidence of previous molestations is substantially outweighed by the danger of unfair prejudice, McLean procedure requires courts to evaluate:

> 1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; 2) the closeness in time of the prior acts to the act charged; 3) the frequency of the prior acts; and 4) the presence or lack of intervening circumstances. This list is not exclusive. The trial courts should also consider other factors unique to the case.

Id. at 1262.

The purpose for which the crime is introduced determines the degree of similarity necessary between crimes. Id. at 1255. When, as in the instant matter, the collateral crime evidence is introduced to establish absence of mistake or accident, the requirement is of "substantial similarity." Id. at 1255.

43

It is well understood that <u>Williams</u> Rule evidence is inherently prejudicial. See e.g., <u>Straight v. State,</u> 397 So. 2d 903 (Fla. 1981); <u>Thomas v. State,</u> 599 So. 2d 158 (Fla. 1st DCA 1992). Thus, trial courts are cautioned to take measures to minimize this prejudice by limiting the extent of <u>Williams</u> Rule testimony and the extent of argument to the jury on the collateral crimes, see <u>State v. Lee,</u> 531 So. 2d 133 (Fla. 1988), and by giving the appropriate cautionary instructions when the evidence is admitted and during the final charge to the jury. The trial court in the case at bar did give the cautionary instructions when the evidence was admitted and during the final charge to the jury.

Although the trial court followed the <u>McLean</u> procedure to determine whether the probative value of the evidence of the two previous molestations were substantially outweighed by the danger of unfair prejudice, its evaluation and conclusion were erroneous.

## A. The *Williams* Rule evidence was not substantially similar to the charged offense and therefore was irrelevant.

First, the trial court relied on the J.M.'s deposition, in which she testified that when she was sleeping alone that Appellant "messed with her rump" and that on two occasions appellant exposed his penis to her (I, 115, Supp III, 42).

R. H. testified that, 12 years ago, when she was 13 years old, she was riding with appellant in his car when appellant touched her on her breasts, over her clothes, and touched her vagina, both over

44

and under her clothes. R.H.'s allegations of prior acts are not "substantially similar" to the charged incidents <u>as testified to in J.M.'s deposition.</u> Moreover, this alleged incident occurred three years before the alleged charged incidents. L. A.'s deposition testimony related that, 11 years ago, when she was 12 years old, appellant had sexual intercourse with her when she was in her bed at her home (I, 116). L.A.'s allegation is also not "substantially similar" to the charged incidents <u>as testified to in J.M.'s deposition.</u> It occurred two years before the alleged charged incidents. The trial court erred in finding that these prior acts were "substantially similar" to support admission to show absence of mistake or accident. <u>McLean.</u>

The trial court also erroneously concluded that the probative value of introduction of the collateral criminal evidence was not substantially outweighed by the danger of unfair prejudice. Because this evidence was not excluded Appellant was convicted for "reasons other than evidence establishing his guilt." <u>McDuffie v. State,</u> 970 So 2d. 312, 327 (Fla. 2007) (internal citation omitted).

### B. The evidence became a feature of the trial.

The emphasis on the evidence about Appellant's alleged sexual misconduct against R. H. and L. A., J.M.'s testimony that Appellant twice exposed his penis to her, and Shantell Harris' testimony that Appellant placed his hand between J.M.'s legs while she was sleeping overwhelmed the charged offense evidence and caused the

45

collateral crime evidence to improperly become a feature of the trial. This occurred despite the trial court stating that she would not allow the R. H./L. A. collateral matters to become a feature of the trial (I, 117). Unfair prejudice resulted because the state made collateral offenses a feature of Mr. Brooks' trial, which had the effect to turn "development of facts pertinent to the main issue of guilt or innocence into an attack on the character of the defendant." Ashley v. State, 265 So. 2d 685, 693 (Fla. 1972); See Bush v. State, 690 So. 2d 670, 673 (Fla. 1st DCA 1997); see also Seavey v. State, 8 So. 3d 1175 (Fla. 2d DCA 2009); State v. Richardson, 621 So. 2d 752 (Fla. 5th DCA 1993).

A collateral offense becomes a feature instead of an incident of the trial when it can be said that the collateral offense evidence has come close to overwhelming the evidence of the charged crime as to be considered an impermissible attack on the defendant's character or propensity to commit crimes. Easterly v. State, 22 So. 3d 807, 815 (Fla. 1st DCA 2009); Ballard v. State, 899 So. 2d 1186 (Fla. 1st DCA 2005). This occurred during Appellant's trial.

This Court has noted that the admission of excessive evidence of other crimes, to the extent that it becomes a feature of the trial, has been recognized as fundamental error requiring reversal. Travers, 578 So.2d at 797; see also Dydek v. State, 400 So.2d 1255 (Fla. 2d DCA 1981) (appellate court may consider fundamental error

46

not raised below nor argued on appeal); <u>Robinson v. State,</u> 462 So.2d 471 (Fla. 1st DCA 1984), rev. denied, 471 So.2d 44 (Fla.1985) (reversal for "fundamental injustice" under Rule 9.140(f), Florida Rules of Appellate Procedure)). In <u>Travers,</u> during voire dire, defense counsel stated that collateral crime evidence would become a feature of the trial. <u>Id.</u> This court ruled that the collateral crime evidence was mostly attributable to defense strategy. <u>Id.</u> Unlike in <u>Travers,</u> in the instant matter, Brooks, acting pro se, did not do anything to promote the collateral sexual crimes to become a feature of his trial.

During opening and during closing the state referred to the four collateral sexual acts (IV, 70-71; V, 207, 211-13).

In the case at bar, it is likely that the jury was unfairly influenced by the collateral crime evidence and prompted to have "a more ready belief" that Brooks might have committed the charged offenses, thus the jury was unfairly predisposed to believe that Brooks was guilty of the charged offenses. <u>Travers,</u> <u>id</u>. The evidence became a feature of the trial, an attack on Appellant's character, and led the jury to conclude that he had a propensity to commit crimes. The cumulative prejudicial effect of multiple references to prior crimes deprived Mr. Brooks of a fair trial. This court cannot conclude that the erroneous admission of the <u>Williams</u> rule evidence did not contribute to the verdict.

47

Appellant's conviction should be reversed and the case remanded for a new trial from which this evidence must be excluded.

## IV. The trial court failed to conduct a Faretta inquiry before imposing sentence.

### Standard of Review

The standard of review is de novo.

### Facts

On February 27, 2013, the trial court sentenced appellant (III, 492). The trial court held <u>Faretta</u> inquiries at pretrial hearings, before jury selection and before trial and Mr. Brooks waived counsel on each occasion. The trial court did not hold a <u>Faretta</u> hearing before conducting the sentencing proceeding (id.).

### Discussion

Recently, this court reiterated the rule that before sentencing a pro se defendant a <u>Faretta</u> inquiry must be conducted. <u>Cuyler v. State,</u> 131 So.3d 827, 828 (Fla. 1st DCA 2014). See also <u>Lewis v. State,</u> 31 So.3d 944, 945 (Fla. 1st DCA 2010)(holding that Fla.R.Crim.Pro. 3.111(d)(5) requires "the court to inquire further or renew the offer of counsel at the sentencing phase. Failure to do so constitutes reversible error.").

In the case at bar, the trial court failed to renew the offer of counsel before conducting the sentencing hearing. The sentence in this matter must be reversed and the case remanded for resentencing.

48

## **CONCLUSION**

Based on the argument and authority presented above, Appellant requests that the case be reversed, a competency evaluation be conducted and a competency hearing be held before a new trial commences, from which all <u>Williams</u> evidence is excluded. Should this court not reverse on grounds alleged in issues one, two, or three, Appellant's sentence must be vacated and the case remanded for resentencing.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic mail to Trisha Meggs Pate, Office of the Attorney General, at crimapptlh@myfloridalegal.com, and a true and correct copy has been sent via US Mail to Clifton M. Brooks, 135510, Mayo Correctional Institution Annex, 8784 US Hwy 27 W, Mayo, FL 32066-3458, on this date, August 7, 2014.

**CERTIFICATE OF FONT SIZE**

I HEREBY CERTIFY that, pursuant to Florida Rule of Appellate Procedure 9.210, this brief was typed in Courier New 12 Point.

Respectfully submitted,

NANCY A. DANIELS
PUBLIC DEFENDER
SECOND JUDICIAL CIRCUIT


/s/ Joanna A. Mauer
**JOANNA A. MAUER**
ASSISTANT PUBLIC DEFENDER
FLORIDA BAR NUMBER 763251
COUNSEL FOR APPELLANT
LEON COUNTY COURTHOUSE
301 SOUTH MONROE ST., STE. 401
TALLAHASSEE, FLORIDA 32301
**joanna.mauer@flpd2.com**
(850) 606-8550